Good morning. We will start this morning with the case of read the Philadelphia bail fund versus the arraignment court magistrate judge number 20-1632 and we will begin with you Mr. Daly. Thank you, Your Honor. May it please the court, Michael Daly, on behalf of the appellants, the arraignment court magistrate, the Honorable Patrick Dugan, counsel. Your Honor, I'd like to reserve two minutes for rebuttal, please. Granted. Thank you. Your Honor, this case is about whether the First Amendment requires state courts to allow court attendees to make their own audio recordings of criminal proceedings. Every court, all the courts of appeals and the district courts who have addressed this issue have held that the First Amendment does not require that. That the right of access under the First Amendment is limited to the right to attend, the right to observe, the right to report on what what is observed in criminal proceedings. The criminal proceedings here at issue are preliminary arraignments in Philadelphia's municipal court arraignment court. The courts that have addressed this issue have recognized that instead of being in a question of constitutional dimensions, it's more of a policy question. The US Supreme Court in the Chandler case stated that it's up to the states to experiment on how electronic media would be handled within the courtroom. Some of the other cases that we cite, the Hastings, the Curley, the Soderbergh case, talk about the fact that it is up to the states and the policy decision to make that determination. Counselor, this is Judge Greenberg. Let me say this to you. I wonder whether the case is overcomplicated. As I understand it, there was no reason, except financially, but no legal reason why the Delfin couldn't have a person who like a court reporter at a trial, at least when I tried cases, who takes down every word that's being said. Is there any reason, I realize it may be that may cost money, but is there any legal reason why the Delfin could not have a stenographer take down every word in any case in which he was interested? Well, the way the Rule 112 reads, Your Honor, which is the state rule applies across the state, which the arraignment court is bound by, does speak about not only audio recordings or broadcasting, but taking stenographic notes. Now, I'm not aware of any case or any instance where somebody's come into arraignment court with a court reporter to take down what was being said, as you mentioned, being a court attendee. The difference here is that we have, you know, the request or the claim from the bail fund was to make audio recordings of these, which carry their own special prejudices, as we point out. Well, what I wanted was, does the Rule also preclude the taking of stenographic notes, as opposed to just general notes that a newspaper reporter might write? Your Honor, the Rule 112, Section C, which is one of the rules at issue here, talks about the, what's prohibited is stenographic, mechanical, electronic recording, other than by an official court stenographer in a court case. So, to be clear, Mr. Daley, it's the magistrate's position that that rule prohibits an observer from bringing in their own stenographer to make the recording. That's what the Rule says on its face, Your Honor. You know, and, you know, from a practical standpoint, right, if you had somebody that could sit there and take dictation, let's say, you know, word for word down on their own handwritten notes, which isn't prohibited, of course, because the press and the public are allowed to take notes from that. Although the Rule says that, I can't say I'm not familiar with an instance where it happened, and I don't know that it would be prevented. You don't know what? That, well, I don't know that it would be prevented unless, I mean, it's a little different from someone taking notes on their own to bringing a court reporter in and, you know, sitting there and typing away with it. Well, what's the magistrate's position as to someone coming, a stenographer being a privately employed to come into the courtroom under the Rule? Is the magistrate's position that that's allowed, or is the magistrate's position that that's prohibited under the terms of the Rule? Under the terms of the Rule, it's prohibited under 112. It says stenographic, which I would take to mean a court reporter. Mr. Chris, you agree that the First Amendment right of access is a right of access to information, not simply to access to the physical courtroom, right? I would agree that there is a First Amendment. There's the First Amendment right of access to the courtroom, and there's a separate First Amendment right to information, yes. With that in mind, you framed the question for us at the outset about whether there was a right for a private party to make audio recordings, but is that, is that really the question for us in the abstract? Or do we need to consider that against the backdrop here of circumstances where the court does not permit any other mechanism for accurate and complete documentation of what is said and done within this public hearing? Well, I think then, you know, you also have to look at what Whiteland Woods said, what this court said, which, you know, of course, you know, we talk about both sides in the briefs in the district court, is whether the regulation here, you know, regulates the manner of access to arraignments or restricts the information. In other words, does it meaningfully interfere with the ability of the bail fund here or anybody who comes in to obtain information about arraignments? It's our position that it isn't. I mean, certainly there is a first, you know, there's a right to information, but it's not an unfettered right to information. There, you know, there has to be some, there's some reasonable limitation on that to the degree of balancing competing interests. Is there a right to information about what arguments are being made by counsel to the magistrate judge and what reasoning the magistrate judge is articulating to make the ultimate decision on whether someone is deprived of liberty or whether they are released with a potential risk of flight? I'm sorry, I missed the question. But whether that information should be constitutionally protected, you mean, the reason that whether that there is a right to that information. I think there's a right to that information and you have a right to come into court and gather that information, which is what the courts hold. Again, the question is whether it meaningfully interferes with their ability to inform themselves. Part of your argument is that there's not meaningful interference because many other pieces of data are available in other places that are public. Correct. Are those categories of information that I just described, are those available anywhere else than within the courtroom setting? As far as the reasoning for what bail is set? Not that I'm aware of, Your Honor, not usually. Usually the documents, the bail bond and the different documents that are filed indicate what the bail is. There may be special conditions on there. In addition, the bulk data reports that we talk about has a lot of objective information, but not necessarily the reasons. Actually, under the Pennsylvania Rules of Criminal Procedure, as it stands now, is that technically the arraignment court magistrate has to provide reasonings for their bail decision when they deny bail. Sometimes during these conversations or conversations, excuse me, during these arraignments, there may be reasoning for that. But again, it's something that can be taken down by people who attend and observe the hearings. So just so I can kind of understand the scope of your argument here. As I understand it, your argument is kind of can be reduced to an argument of a question of degree. It seems that you willingly admit, concede might be what you're doing, but I don't know if it's challenged, so it might not be a concession, that the public has a constitutional right of access to bail hearings. You just say that that constitutional right, the degree of that right stops when it comes to the ability to record, in this case through electronic means, that information. I mean, is there anything, it's just a question of degree. Is that right? You take it up to a point, and then you say past this point, there is no constitutional protection. That's correct, Your Honor. You know, past the point, I mean, you know, we don't disagree that there is a First Amendment right to attend to the bail hearings. And that, you know, what the State Supreme Court has done here and arraignment court have done here, as many states have done in having these type of regulations is to balance the constitutional interests here. Certainly the First Amendment right for the public and the press to attend and to obtain information, but also for the affirmative constitutional duty to ensure that, you know, to mitigate the chance of any pretrial prejudice, to make sure that there's a fair trial. And also to ensure that the administration, that the state courts can administer their courts. So doing all of that, you know, for these de novo preliminary arraignments, again, going back to what the courts have held is there's no constitutional right and it becomes a policy question. And here, you know, there's a wealth of information that's available about arraignments. And, you know, the US Supreme Court said in the Hollingsworth case when it was in the Proposition 8 case talking about whether or not courtroom proceedings could be broadcast, they were dealing with an administrative issue there, but they did say reasonable minds may differ on broadcasting and what type of regulations or whether broadcasting should be done. You know, this rule here is a statewide rule. I mean, the ruling, although technically limited to arraignment court and as applied here, you know, pretty much reverberates across the state. As your honors are aware, there's basically the same challenge in Allegheny County. And these challenges can also be brought in the Magisterial District Courts, which are very different as far as logistics and administrative issues with this. Again, it's here, and it's difficult to measure that any potential prejudice. The plaintiffs, or excuse me, the appellees cite to, you know, well, we don't have any specific case that says because there was an audio recording or something got out that there was prejudice, but the courts, the Gannett case, the Estes case, talking about that type of prejudice is difficult to measure. The issue of whether we're talking about here simply a means of recording, whether there's a particular right, for example, to an audio recording. Is that really the right of access an issue, or is the question, whatever the mechanism that's put forward, whether the government through its regulation, given all of the circumstances that apply, has materially interfered with that right to information? And if so, then why are we talking about this as a right to an audio recording as opposed to a right of access to information such as the reasoning for these decisions that are being made in the magistrate court 24 hours a day, seven days a week? I see my time is up, Your Honor, and I assume I can answer your question. You can. We appreciate both the technical side of this and also the importance of this issue. We have questions, and to the extent you can be helpful with answers, we will exceed time for both parties. Thank you, Your Honor, and now that we've done that, I'm trying to go back to get to the gist of your question, which might have been my fault for asking for additional time. I'm sorry, Your Honor, could you just give me that in a nutshell again? The question is, why are we talking about this as a right to do an audio recording as opposed to a right of access to information that seems like critical information about the reasoning for bail decisions? Yes, Your Honor, I agree that, again, I think as we've said throughout in the lower court and this court, the Whiteland-Woods standard, whether it meaningfully interferes, I think is the proper standard here. Certainly, the other courts that have looked at ... The issue of transcripts came into this case late and it was introduced by the district court because the complaint here has always been about making audio recordings, that we need them for the tone and tenor and to insert them onto online reporting audio clips. Have they ever sought the right to make a stenographic record? Because a stenographic record, when I was ... It's been many ... It's been, I guess, since the 60s, since I've been a lawyer and tried a case. In those days, there would be a person sitting there and when I started, they were using pads and shorthand and then toward the end, as I remember, they were using little machines. Have they ever sought to make a stenographic ... The right to make a stenographic record? I think, Judge, you may have the appellees in this case ever sought that? Yeah, that's right. It would be the appellees, of course. Have they ever sought ... In other words, you read a rule that might preclude that, but that would be, I think, probably less intrusive than a recording. But have they ever sought that? Because I viewed this case as one in which they were not seeking that and what they were seeking was simply the right to record it. Not in this case in particular. Obviously, Mr. Riley may want to address that as well, but this case was brought as an audio case. The issue of transcripts came up during the underlying litigation. The district court was interested in the issue. Judge Cross, back to your question. If I may continue, I know I'm way over time. Interestingly, although, as we point out in the brief, there's other courts that have rejected First Amendment challenges to Rule 53 and the federal rules and a couple state things. Although there were transcripts available, they didn't rely on that as a basis of the holding. A couple of them mentioned it in passing, but it seems that if you're going to say there's no First Amendment right to make an audio recording because there's transcripts available, that they would have said that and they don't. Pennsylvania is not unique. There's a lot of states that at lower levels don't have transcripts or audio recordings of summary type criminal cases or other bail arrangements. Can I just pick up on that as a practical matter? As I understand it, and again, correct me if I'm wrong, state law requires some inquiry into the ability to pay at a bail hearing. Let's assume for now that there's no recordings of this that constitute judicial records. The only recordings are used for sound check purposes and some sort of other qualified. And so let's say a person who has bail set, and they say, hey, you didn't deny my bail, so you didn't have to go give a statement of reasons for denying my bail, but you set my bail way too high without an ability to pay, without even making an inquiry into an ability to pay. So just walk me through what's going to happen there on de novo review. They say, hey, this didn't happen, and then de novo review, what do you do? You sit there and one person says, oh, it did or it didn't, or is de novo review the point to just be curative? Well, ask now whether you have an ability to pay, but what exactly happens if that critical inquiry is not made? How does the court system, as a practical matter, know whether or not it has been? And if the court system doesn't know, then that's a problem for the public too. Well, again, it's totally de novo, Your Honor. So it starts anew, the factors that are taken into account, you know, all the factors that are listed in the rules of criminal procedure. In fact, you know, interestingly, that issue is sort of before the Pennsylvania Supreme Court now. It's stated in the brief, you know, last year, the Supreme Court appointed Judge Cleland as a special master to look into how arraignments were being conducted in arraignment court. And one of the issues that came up from the petitioners in that case was whether or not there should be some type of verbatim record. And I know we cite to the special master's report, and then he says whether they should be the policy determination, they're not required because it's a total de novo hearing. And then there's a lot of administrative cost benefit analysis. So, in other words, so, Judge, if, you know, if you were to arraign me and I didn't like the bail you set, and if Judge Krause was the next judge, you know, higher, I could go to her and file a motion or an appeal and we would start over again. Judge Krause would review the factors and we would start from there. So it's de novo. And just to complete the thought, is there a transcript or some full right of access to that de novo hearing? That the public could see? In arraignment court. The next step up, right? Yeah. And I guess de novo happens, what, audiovisually or telephonically or something in arraignment court? Yeah. But the point of this is, like, so you get the de novo review. That's great. But so you start all over again. And let's say there's no ability to pay inquiry there. And let's say that the person brought before the court says, hey, I'd like to be asked that at some point in time, and it's never recorded at either stage. Isn't that a problem in terms of just finding out what happened? Or what do you do? Is there some work around there that you have? So, Judge, let me explain how it works in arraignment court, because it's different than how it works across the rest of the state. In arraignment court, there is an emergency municipal court judge who's available. So usually, you know, the arraignments are done sort of, I think there's about three blocks a day, roughly. And that if, at the end of that block, if either side, which may usually be the defendant, wants to appeal that bail, that there's an emergency judge who's available by phone. That in and of itself is not, there's no, again, there's no official verbatim record of that. There is a document that comes out of that that's filed as to what the outcome of the bail appeal is. If later on there's some type of motion filed, you know, where it's a little more formal, those next hearings up, my understanding is that there are audio recordings made and then could be transferred into a transcript. Is it also the case that the defendant is not present by video for that de novo appeal? Yeah, my understanding is that first emergency de novo appeal, that I believe that's correct, Your Honor. So if there was other information that the defendant had contributed to the record at the initial hearing, that also, there would be, that wouldn't even be available for the reviewing judge? Well, through counsel it would be. So, you know, and I'm sorry, as you know, at arraignment court, the Defender's Association is pretty much assigned to everybody who has, who's being arraigned. Counselor, we understand correctly, too, that at these EBR hearings that there is a recording made, an official recording and or transcript available? Yes, Your Honor. And has the magistrate experienced there a disruption to the decorum of the courtroom or prejudice to a defendant's ability to have a fair trial? Not that I'm aware of, Your Honor. Again, there's a couple of distinguishing factors in that those EBR and later hearings, from the prejudice, from the audio perspective, there's no audio of those released. If anything would be released, it would be a transcript. So there is a bit of a difference there. And there's also the, you know, for arraignments, what you have is the potential for prejudice, and as the First Circuit said in the In Re Globe case, you know, that there's a heightened concern about fair trial and prejudice at an arraignment because, you know, a lot of times there hasn't been much opportunity for a defendant to speak to counsel. So there's also, you know, I mean, the bail fund points out in one of the reports sometimes that these arraignments, the defendants might just start talking about the underlying charges. The magistrate stated in response to the special master's report with the Supreme Court that it would make sure that there were such opportunities for the defendant to confer with counsel at these hearings, right? Yes, Your Honor, that's correct. And there used to be, and it gets a little complicated, but the Defenders Association in that case, under my understanding, weren't going out, stopped going out to the police departments where the defendants were for unrelated reasons. But certainly the arraignment court has, as we said in the special master's case, doesn't have an issue with having, obviously, defendants speak with counsel before an arraignment. I suppose it will all become a bit more facile with breakout rooms. One other question, just to understand, Rule 112D, as I read it, it appears to authorize a recording to be made of the judicial proceeding by the court, by the defendant or defense counsel, and by the prosecutor. And then places a restriction on their use of that information, but not on their ability to create the recording. In the context where that has been employed in the courtroom, has it created, again, any disruptions to decorum or prejudice to a fair trial? Not that I'm aware of, Your Honor. In arraignment court, I'm not. I mean, certainly the rule provides that it can't be publicized. It's different if you have counsel at counsel's table and say, well, I guess now you can probably set your phone up, as opposed to an actual recorder. To do that there where it's obvious, certainly counsel or defendant are under more control of the court than somebody sitting back observing. I'm not aware of any, Your Honor. And this, you know, no. And what has been proposed by the bail fund is simply a small handheld recording device, from what I gather from the record. Is that right? Correct. Do you view that as more or less disruptive than bringing in a court reporter to do a transcription? Well, I would, from the disruption side, in thinking about if I was sitting in court, I would say that a handheld recorder would be, could be less disruptive. I mean, the issue is if, you know, if 10 people show up and, you know, the arraignment court magistrate has to determine enforcing this rule is, you know, are they only using a silent handheld recorder? Is somebody using the phone with video? Is someone taking pictures? I mean, in a way, if somebody just brings a court reporter, assuming that it's silent, at least you know what it is. Are the sheriffs policing that now in the courtroom? My understanding is that they are not, they don't, they're not in the courtroom. So if there was an issue that they would be called down, but they're not there to monitor it. So it's left to the good faith of folks in the audience who might have a handheld device out, whether they're using it for recording or they're using it for text messaging or something else. Correct. And, you know, that's the issue here. I mean, certainly it's hard for the arraignment court magistrate sitting there to determine, you know, who's using this for what. I mean, certainly we, you know, we understand that the appellees, the bail fund is using it for their purposes, but there could be someone who come in and taking these things for, you know, prejudicial purposes and put out on the internet. But none of that matters. I mean, none of that matters. It's a public right of access. And so different members of the public want information for different reasons. And so some people want it to do reform. Some people maybe want it to, you know, highlight other aspects, but that doesn't matter the First Amendment inquiry, does it? Well, let me just clarify, I'm not saying that it depends on what they want to use it for, whether they can come in and attend and observe and take notes. My point was more of the reasonable regulation to prevent audio recording and the prejudice of a defendant's own words getting out. So if the First Amendment says that you can make your own audio recordings and then take them and distribute them anywhere, but that's a potential prejudice that the state can mitigate against. I agree. I'm not saying that just because somebody wants to come in and, you know, write something critical of the court system or write something nice about the court system, that that should matter, whether they're able to attend and observe under the First Amendment. Great. Thank you. We'll return to you. Unless Judge Greenberg, do you have any other questions at this time? Otherwise, we'll return for the rebuttal time and we'll turn to Mr. Ryland. No, I don't have anything else as attorney. Thank you. Thank you. Good morning. Nicholas Riley for the Philadelphia Bail Fund. I'd like to start just by jumping in with addressing one of Judge Krause's questions about the contours of this right of access to information, because I think that really does go to the heart of what this case is about. I'm sorry, counselor, but I didn't catch your name. Can you repeat that? Sure. Nicholas Riley. Okay. I'm on the chart. Okay, fine. Thank you. Great. But turning to Judge Krause's question about the contours of that right of access to information, we frame it even more, I think, specifically as, in this context, a right to a comprehensive record of the proceedings. Now, of course, that language, comprehensive record, that comes from Whiteland Woods when this court was explaining why the right of access wasn't violated in that case. The reason it gave was because the plaintiff in that case was able to obtain a comprehensive record of the proceedings. But even stepping back from Whiteland Woods specifically, that right to a comprehensive record, that's just fundamentally baked in to the broader right of access under the First Amendment. The reason the Supreme Court tells us, and this court tells us, the reason why the First Amendment protects the public's ability to get into the courtroom and observe court proceedings is, of course, to safeguard people's ability to discuss those proceedings, to engage in public discourse outside of the courtroom. The free discussion of governmental affairs is the ultimate objective of the right of access. That free discussion of governmental affairs is the language that gets echoed again and again through all the right of access cases. And that free discussion, that discourse rests fundamentally on the public's ability to memorialize what happened. Well, let me just, let me just, I mean, I get that. Let me just, let me just point out something in one of the amicus briefs that I found notable. And this is the amicus brief of Cato Institute, ACLU, and Pennsylvanians for Modern Courts. On pages eight and nine, there's a series of bullet points in this brief that tells, you know, a litany of things that maybe members of the public in that discourse would say these are a problem. For instance, quote, a magistrate imposed $500 cash bail after learning that the defendant was homeless and staying at a shelter, quote. And there's a bunch of bullet points on here. So I guess my thought is if there's – these, strike me, is allowing for meaningful public discourse of this issue. And so I guess the question is, do you think these do not allow for meaningful public discourse? I wouldn't put it that way. I think they do allow for some discourse because – Meaningful. My question is meaningful public discourse. Right. These look good to me. Right. We agree that those look good. They are not comprehensive and thus are infringing meaningful public discourse. They're restricting that. Does something have to be comprehensive to allow meaningful public discourse? Yes. Our view is that it does. And not just because – It's your view, but that's kind of dicta in Whiteland Woods. Whiteland Woods was a case that limited – it didn't give full comprehensive. There was videotapes there that they said you don't have. So, I mean, it depends what you mean by comprehensive. Comprehensive doesn't mean everything that's possibly available. So it sounds to me that there is the ability here to allow for meaningful discourse. I thought that this list did a great job of saying if the public is concerned about this issue, you've got data. I assume there's way more data than just this. Right. So we take comprehensive in Whiteland Woods to mean a verbatim record because all of the alternative means of documenting the proceedings that Whiteland Woods pointed to would yield a verbatim record. And the difference between having a verbatim record and not having a verbatim record is a night and day difference. It's the reason why appellate courts, for instance, require transcripts of lower court proceedings. It's the reason why newspaper reporters quote their sources instead of paraphrasing. So let me ask you this then. Let's say this case takes place not in 2020 but in the 1790s. Before we have any sort of audio recording, before we have stenographic records, before we have anything else like this, this bullet point list is going to be about as good as anyone walks out of that proceeding with. And so is it your position that the Constitution has kind of, over time, allowed for, moved up and said, no, you get something better than this list and technology improves, that the Constitution is somehow tethered to technological improvements so that when more improvements are available to allow a more comprehensive record, the First Amendment follows that? Let me ask you this, Counselor. Does the Supreme Court of the United States allow recordings of the arguments in that court? The Supreme Court does not, although the Supreme Court does release audio recordings of all of its arguments shortly after argument. But turning to Judge Fitz's question about technology, we don't think that the right of access is tied to technological developments in what the recording capabilities are. We do think it's tied to what the public expectations of a comprehensive record are, and those do evolve over time. Nowadays, if you want to say what actually happened, you do need to have a verbatim record. There's a good example of this in the record in this case. I point the court to page 123 of the Joint Appendix, the Declaration of Malik Neal, the Director of the Bail Fund, where he talks about being in meetings with public officials about bail in Philadelphia and having those public officials dispute the bail fund's characterization of what the prosecutors are saying at these hearings, what the public defenders are doing at these hearings. The only way to resolve those fights in discourse is to have a verbatim record, because that's what the expectation is. So that's what we mean by comprehensive record. I should say also, we think that on this link, this bridge between getting into the courtroom and that first phase of the right of access, and then the public discourse that happens outside of the courtroom, that last phase of the right of access, this court's decision in Fields, I think, highlights why the First Amendment is so concerned with restrictions on the public's ability to document what the government is doing. As Fields puts it, there's no practical difference between suppressing the public's ability to document what the government's doing and suppressing speech about what the government's doing. Certainly, there are reasonable restrictions that can be imposed, and we recognize Fields was dealing with police activity out on the street. But that link, that connection between that threshold right of access to the information, the ability to then talk about that information, use it in public discourse, to take that information as an input into the output of that free discussion of governmental affairs, that all hinges on that intermediate step of being able to document what the government's doing, and to be able to document it in a comprehensive way. I would note that the amicus brief—I'm sorry, Judge Kiss, it looks like you were— No, I mean, look, I get that there's a game of dominoes going on where right of access triggers right of speech. But at the same time, the federal government has done a lot of things for not just courtrooms, but it was a statute that enacted the Freedom of Information Act. It was a statute in Pennsylvania that's the Right to Know Act. And so it seems that, you know, while there is a game of dominoes going on, that a lot of times these open access provisions come not through constitutional demand or requirement, but by just the willingness of a democratic society to allow transparent and open government. And so I think the tension that I have with your point is just, when does something become constitutional? Because certainly, you know, I don't think anyone's saying that the access requirement of the Freedom of Information Act is a constitutional imperative. And when is it just maybe good government? And so do you have any kind of limiting principle there, or are we back to a comprehensive record? Right. Well, I think there is a limiting principle, at least one, which is that this right to a comprehensive record that we're describing, that Wetland Woods recognizes, that only kicks in if, at the threshold stage, the First Amendment right of access attaches in the first place, right? So, you know, as the court knows, there is this logic and history test that the Supreme Court has handed down in Richmond newspapers on through the, you know, the years and applied repeatedly that says, the First Amendment right of access, that constitutional require, and all that it requires, doesn't necessarily kick in for every type of governmental proceeding. A couple years after Wetland Woods, for instance, this court decided the North Jersey media, the Ashcroft case, which dealt with the right of access to deportation proceedings or a certain type of deportation proceedings, and it said that the right of access didn't kick in there. If the right of access doesn't kick in in the first place, then everything that follows from it, including this right to a comprehensive record, doesn't follow from it. So that, I think, is a limiting principle that's already embedded in constitutional law. I'd like to address very, I'm sorry, Judge Krause, were you? Yes, counsel. Is it your position that this issue of a right to a transcript has already been addressed by Press Enterprise 1 and 2 in our decision in ANTAR, or is it really, is it just a wide open question for our circuit? I wouldn't say it's wide open. So to your question, we're not saying that ANTAR or Press Enterprise firmly say that a court has to produce its own transcripts or hold proceedings on the record. That's not our position. We do think ANTAR makes pretty clear that if a transcript exists, that the right of access attaches to that transcript. Obviously, we're in a court of no record here, so there are no transcripts. So the question is, what can the court do to restrict the public's ability to memorialize the proceedings? What can they do to stop the court from obtaining a comprehensive record of the proceedings? That's the universe we're in. We think ANTAR is instructive for all the language in ANTAR that highlights why it's important to have documentation. We think that it's just reemphasizing the same point that the court doubles down on in Whiteland Woods a few years later that is about the importance of what I've been referring to as that bridge between getting into the proceeding and engaging in public discourse about the proceeding. So why isn't it a reasonable restriction when we consider the reasons that have been put forward by the magistrates? And indeed, even the Defender Association and the Pennsylvania Association of Criminal Defense Lawyers acknowledges that there is the potential for prejudice to defendants or to the fairness of a trial. Although they obviously, from their argument, view that as outweighed, but nonetheless, they acknowledge that as legitimate interest. Assuming that's the case, then why isn't it a reasonable restriction to say, there can be access in the courtroom, there can be taking of notes, but we're going to draw the line at contemporaneous recordings. And if we say that they're not entitled to do that, notwithstanding those legitimate interests, are you then asking us to mandate as a matter of First Amendment law that a court create records like transcripts that don't otherwise exist? Right. So a couple of responses. First, on that first part of the question, assuming that there is a potential of prejudice, why isn't that good enough to justify these restrictions? The reason is because there are already safeguards for that. And specifically, and I think this is another limiting principle to Judge Phipps' earlier question, we're not contesting that the First Amendment allows judges, if they can show that specific need, that specific harm in a particular case, to close the courtroom. There's a standard that's set for that in all of the right of access cases. It's a high standard, but it exists. And we don't take issue with that. That's exactly the standard that the court, the First Circuit applied in the In Re Globe case that the magistrates rely on. So that's always available to the magistrate if they can actually show in a particular case, there really is a real risk of prejudice here. I would note, though, also just on this assumption that there is this potential for prejudice, even if the potential exists in the abstract, there's no evidence, again, that happened in Pennsylvania for the other types of proceedings that happen on the record. And there is no shortage of other jurisdictions, including the district court that decided this case, that make audio recordings of all of their hearings, including bail proceedings, available to the public without any consequence. The sky hasn't fallen. Footnote 9 of our brief includes a non-exhaustive list of numerous jurisdictions, including many big cities. So maybe this begins to double back onto your point of it's the public expectations that drive what sort of First Amendment right of access should come into play, because they're saying all these other courts do it, hence there's public expectation. But isn't public expectation, a standard of public expectation, really just a proxy for a democratic process? I mean, how are we to evaluate public expectation? We take a poll, we learn that 80% of people want it. Well, if 80% of people want it, then haven't we kind of just somehow baked in a democratic process into a constitutional standard? And that's really strange, because I know, because it seems to me that what would happen is if 80% of the people want it, and you have a working democratic process, they just vote and change, you know, change Rule 112. So I guess my thought is it seems that public expectation begins to get a little bit problematic, because if it's driving the threshold for constitutionality, why do we even care about constitutionality, just have them change Rule 112? Right. So I want to be very clear. We're not saying that public expectations determine the contours of the right of access. We're saying public expectation informs how you conceive of what a comprehensive record is. So to your earlier question, in the 1790s, no one expected a comprehensive record of a court proceeding to include a verbatim record, because it was virtually impossible to do that with a quill and a bowl of baked ice cream. The reason that's different now is because all courts, and I do think that what's happening in these bail hearings is unique, most courts do have verbatim records being kept. So when the public wants to know what happened at a given proceeding, the verbatim record is what they're expecting. Again, that's what appellate courts expect. This off-the-record bail hearings, off-the-record proceedings about whether or not a person is going to go to jail or go home, that is rare. It doesn't happen in Delaware. It doesn't happen in New Jersey. It doesn't happen in numerous states across the country. And so it doesn't happen in any federal district court in the country. So when you're in that unique circumstance where there is no other means of obtaining a verbatim record, we think that is different because, again, that's the difference between — it's a night-and-day difference between finding out what happened. So would your argument change if this case, if Philadelphia wasn't an outlier? What if all of a sudden every court did it the exact same way Philadelphia does? Does that change your argument, or does your argument say, no, we still have a constitutional angle here? I think if by every court doing it the way Philadelphia does, if you mean every court in Pennsylvania, then — Or every court in the nation. Every court in the nation. I mean, again, it's strange to kind of get in that world because it's so different from the norm. But if it were the case, then I think that might actually change what public expectations of a verbatim record were. I think then you might be closer to that 1790 situation where it really was just the case that there were no verbatim records. Again, though, that's not where we're at right now. We're in a situation where this is very much the exception to the rule, which is on-the-record proceedings, particularly high-stakes proceedings like this. And when you have high-stakes proceedings like this that are happening entirely off the record, and where it's not disputed that no one can obtain that is a verbatim record of these proceedings, that's a different circumstance. And it really is not in dispute here. I would point again to page 123 of the Joint Appendix, the Declaration of Malik Neal. He says it is impossible. And part of that's because of the nature of these proceedings. It is impossible, given the rapid back-to-back-to-back nature of these proceedings, the volume of information that's being exchanged. It is impossible for a person, even a skilled notetaker, to come away from those with handwritten notes with a verbatim record of what was said. That's not in dispute. Counsel, let me ask you this question. This case is brought on behalf of the Fund, which in itself doesn't have a concern about bail for itself. Suppose a case is brought on behalf of a defendant who asks the magistrate whether he can make a recording of the proceeding. Is the result any different? Right. So just as a threshold matter, the rules actually do allow the defendant to make a recording of the proceeding right now. So Rule 112d allows the parties to the case to make their own recordings if they want. So there would be no need for the party to bring that case. I do think that provision that Your Honor is now highlighting, 112d, does underscore, and I think one of Judge Fitz's earlier questions went to this point, does underscore, there's a value, obviously, that the rules themselves recognize in the parties to the case. The parties having a verbatim record of these proceedings for their own purposes. Let me ask you this question. You have sought relief to be able to make a recording. You have not sought, as far as I can see, the right to make a transcript with a stenographic record which a court reporter would make. Suppose the court said, well, we're not confining with that because they're not seeking it. But the issue of recording is a separate issue and there's no challenge to the aspect of the rule that says that you can't make a stenographic recording. Sure. Now, a stenographic recording would be just as good, except I realize as a practical matter that would be hard to do. But wouldn't that give you complete relief? So it would be a question of money, not the ability to get the information. That's exactly right. It is a question of cost. It would be cost prohibitive. And that's the reason why we didn't seek that particular relief here. And I should say, when we talk about this meaningful interference standard from Whiteland Woods, that has to apply to whatever means of providing a record the court makes available. So in the same way that making transcripts available at $500 a page or something exorbitant could still raise a First Amendment access question under that meaningful interference standard. So too would requiring the public, if they want to obtain a verbatim record, to bring in their own stenographer to hire another person to come in. It's also important to remember for these proceedings in particular, which are happening 24 hours a day, seven days a week. The cost of having to hire a stenographer to come in, in many instances, after hours and oftentimes have to wait because you don't know when any given hearing is going to start. You'd have to be paying them by the hour is, I think, extremely burdensome. I think it's also the case just practically that most stenographers now, and this isn't in the record, but most stenographers now require an audio recording to really ensure accuracy. You know, they're not actually simply able to capture a verbatim record nowadays with just their simple stenographic device. The last point I'd make on this, because it is a good question, Judge Greenberg, is I think you'd have to wonder what the underlying motive is for a rule that allowed stenography and only stenography as the only means of obtaining a verbatim record. At the point where you're requiring the public to go hire another person and bring in another device, a much larger device, in order to capture a verbatim record and shell out all that money. It would seem that the purpose is really just to make it difficult for the public to obtain a record. Because, again, on the record before us, it's not disruptive to bring in a handheld, silent, non-cellular device, especially, you know, the bail fund specifically said when it wrote and requested permission to use this recorder, it specifically said, we will let courthouse security inspect this device in advance. Right? Under those circumstances, there's surely no disruption or risk at allowing them to use the handheld device, which would be just less burdensome for all parties. I can see that my time is up, but I'm happy to answer any other questions the court may have. I don't have any more questions. The record also indicates that now the magistrate's court does make their own recordings. But those recordings are not made available to members of the public on request. Do you agree that if those recordings, which were already made by the magistrate's court, were available for even inspection on request, or, as I gather is happening now as a result of the district court's order, that the magistrate's court was making transcripts available at a reasonable cost, under either of those circumstances, that the bail fund would not have a meritorious, as applied, First Amendment challenge here? I think that's right with the conditions that you impose. That is, if the transcripts, for instance, are being made available on a reasonable basis, at a reasonable cost, and they're completely inaccurate, then, yeah, I think that would solve the violation of the right to a comprehensive record. Similarly, if those audio recordings were made available to the public, and they actually were capturing what's happening during the proceedings, you may know there was some dispute in the district court about the quality of those recordings. We've never actually heard them ourselves. But if they really are capturing everything that's happening during the proceedings, and they were made available to the public, absolutely, we think that would cure this violation of the record. There's always a problem there, though, right? Because you can always do one better. You can say, okay, transcripts are better than no transcripts. Audio is better than transcript, because it can capture tone and other things. Video is best of all. It can capture facial expressions, and I can tell you're good at it, because you've known when one of the judges here has wanted to ask you a question, and you've stopped. So, I mean, we've got a hierarchy of media here. And so, this comprehensive standard, you can always say, I want something better, because new media gives you better. That's why people like new media. It tends to be better. And so, one of two things is possible. I mean, I don't see a limiting principle. We either go to the outer limit of media and say, you get the best, because that's what comprehensive means. It should be video. Or you get the minimum, which is show up, take notes on your pad of paper. But in terms of what's in the middle, in terms of saying, okay, there is a limiting principle that gives us a middle ground, just talk to me, because I think video is better than audio. That may be why I may not be alone. That may be why we're doing this via Zoom. And so, when does it stop? Yeah, I think Whiteland Woods is actually a perfect illustration of where it stops, right? Whiteland Woods, the analysis turned on, do you have just a threshold question for the plaintiff to make out a right of access claim in this context? A threshold question, do you have another ability to obtain a comprehensive record? Where, again, Whiteland Woods meant a verbatim record. That's where we are drawing the line in this case. Comprehensive record here means a verbatim record. And just as Whiteland Woods said, hey, you can obtain a verbatim record through stenography. In that case, you could obtain it through audio recording, these other means. You don't get a right to videotape. That's how the analysis works. So, let's just say this. Let's just say that the magistrate in bail court said, you know what we're going to do? We aren't going to go fast. These aren't going to be four-minute hearings. We're going to speak really nice and slow. Really nice and slow. For everyone in the room, anyone that wants to take this down, we're going to go real slow. You can get every word that I'm saying. In that instance, where members of the public would be assured that, hey, look, we can all take it all down. 20 of us can show up. We can all take it down. There might be some dispute later, but there will be 20 of us who take it down this way. In that scenario, wouldn't that be sufficient for comprehensive? I think it comes close. I think the one aspect of that scenario that I think would still be potentially problematic under Whiteland Woods, on that meaningful interference standard, is that it really required 20 people in order to obtain a verbatim record. That, I think, could potentially raise problems. Well, one might be good enough, 20 just so there's no dispute. It could be two, it could be three, it could be X number of the public who would sit in the room. Got it. In that circumstance, if it was undisputed in the record that an individual could walk into a proceeding and with a pen and a pad could capture a verbatim record, and it was reasonable for them to do so, we'd be in a very different case. In this case, the opposite is undisputed here. The opposite being it is undisputed that a person cannot do that in these hearings because of the way these hearings operate. And that's not just the undisputed declaration of Malik Neal, again, page 123 of the Joint Appendix. That's echoed by the very brief, I think Your Honor cited earlier, from the Cato Institute, the ACLU, and the Pennsylvanians for Modern Courts. For all the instances they talk about, of instances that they were able to capture, one-off lines, things like that, they also say, I think explicitly, that they could not capture a verbatim record. They could not capture more. There were things that they missed in their court-watching efforts. So here we really are in a situation where there's no question that you cannot do what you're describing. You cannot get a verbatim record by showing up. Not only because of the speed, or was that also because of the 24-7 nature of these hearings? And what effect would that have on the ability to produce an accurate and verifiable record for purposes of public debate? Well, I think it's a combination of those things. I don't think that there's any one factor that's making it. And I think the Neal Declaration identifies a few different aspects as to why it's impossible to capture a verbatim record. But to your question about how does that impact the public debate, I think it impacts it substantively in that the inability to obtain a verbatim record colors the ability of your credibility when you engage in public discourse about this issue. It's the same thing that Fields talks about when it says how recordings lay aside subjective impressions for objective facts, right? That's the same issue that we're talking about when it comes to the difference between a verbatim record, like a recording, and simply handwritten accounts, right? Again, there's these disputes that the bail fund has had with public officials over their accounts of what's happening. There is a concrete difference between having a verbatim record and not. And in these proceedings, we know because it's undisputed in the record, you cannot walk away from these proceedings with a verbatim record. You cannot walk away from these proceedings just by showing up with a pen and a pad. Judge Greenberg, do you have any more questions? I don't have any more questions. Judge Fitts? No, no, thank you. Thank you, counsel. And we'll now hear from Mr. Andy on rebuttal. I'm sorry, Mr. Daly on rebuttal. Yes, thank you, Your Honor. Just a few points I'd like to follow up on. As Judge Fitts started off in his questioning, you know, what is the First Amendment right of information and how far does that go? Judge Greenberg, writing for this court in the Creamer case in 1992, recognized, which I think is undisputed, that the right to receive information is not unfair. I mean, to the extent you want, if somebody needs comprehensive information about what goes on, why not constitutionally require state courts to make judges available to be interviewed or jurors? Why not constitutionally require the bulk data compilation that Pennsylvania provides? So in this case, and what all the courts have held in looking at this, is it's a policy determination. The states are free to experiment. It's an issue of federalism and comity, and the state courts are in the best position to weigh all of these constitutional issues and deciding them. So isn't the real tension here, I mean, in terms of legal standards that are just butting heads, isn't the real tension here between, on the one hand, a comprehensive record, and on the other hand, a qualified as opposed to an absolute right of access? And it seems that those are smashing into each other, and at some point in time, we have to decide, you know, a complete and comprehensive record doesn't always feel consistent with a qualified right of access. And so it seems that it's those two legal principles that are butting, and we either have to find a middle ground between them or we have to pick one. What do you think about that? Have I phrased that conflict correctly, or am I missing something? I think, Your Honors, I mean, the Supreme Court has said it's a qualified right of access. You know, this phrase about a comprehensive record, I'm not aware of constitutionally where that's coming from. I mean, you have the, and I see my two minutes are up. I'll continue. You know, you have, again, back to Whiteland, does it meaningfully interfere with, you know, the ability to obtain information about what is going on? I think when you look at that, and again, you look at the courts that have said that this is a policy determination. I mean, does it need to be word for word to meaningfully interfere with what's going on? Or is it enough that you can go in, you can observe, you can take notes, and you can gather all this other information that's available? Again, as a policy determination that the state court has made, Judge Kraut? Counsel, on this matter, I take it from the absence of arguments on this point that you agree there is a First Amendment right of access to bail money. Yes, the right to attend, yes. And to the extent you seek to limit it to the right to attend and have physical presence, how do you reconcile that with the statements of the Supreme Court in press enterprise? That denying the transcript in that case would frustrate what is characterized as community therapeutic value of openness, which it says lies in the fact people not actually attending trials can have confidence that standards of fairness are being observed because of the availability of those transcripts. And our statements in ANTAR, you know, including that the holding itself, that the First Amendment right of access extends equally to transcripts as to live proceedings. How is saying that the constitutional minimum is satisfied simply by physical presence, you know, consistent with that case law? Well, first, as the appellee's counsel pointed out, they're not arguing that the Constitution requires the courts to make transcripts in this. I mean, certainly in ANTAR and the Martin and some of the other cases that appellees cite, transcripts had already existed that were provided. And that's a separate issue that isn't an issue here. Well, isn't it really the same issue? Because their argument is there needs to be a comprehensive record, meaning a record that is complete and accurate, you know, and therefore verifiable so that it can contribute to the public debate. It seems that these statements in Press Enterprise and ANTAR indicate that the Supreme Court and our court have already accepted the proposition that a transcript is important and essential to fulfill that function. Now, whether the transcript, you know, there's an audio recording in lieu of the transcript or the transcript is made not by the court but by, you know, someone in attendance was not the focus of those cases. It was simply, why don't those cases simply confirm the notion that the minimum for a comprehensive access is, one way or another, a complete and accurate recording? Well, first, Your Honor, again, no courts hold that a transcript has to be provided. And secondly, you know, it also depends on what other information is available around those types of hearings. You know, not just what is said, but what other information. And then we talk about the other information that's available here related to every arraignment that takes place. So, again, in that, bringing it back to meaningfully interfering, you know, to be able to attend and observe is sufficient under the Constitution. Now, you know, again, this is a policy issue. In fact, Appellee's Counsel in this case has filed an amicus brief in the State Supreme Court arising out of the special master's recommendation, asking the State Supreme Court to make these arraignments to be verbatim. So that issue is before the State Supreme Court right now, and they can certainly decide to change, you know, Rule 115, which talks about making verbatim recordings as a policy decision, and they're in the best position to do so. I'm still having trouble understanding how you reconcile that with our decision in ANTAR, where we said that access to the documentation of the open proceedings facilitates the openness of the proceeding itself by assuring the broadest dissemination. It would be an odd result indeed were we to declare that our courtrooms must be open, but the transcripts of the proceedings occurring there may be closed. For what exists of the right of access if it extends only to those who can squeeze through the door? You seem to be saying, nonetheless, that those who can squeeze through the door is sufficient for the First Amendment right of access. Didn't we hold otherwise? I don't believe so, Your Honor, because I believe ANTAR is distinguishable. I mean, the First Amendment right of access, as it is in this case, wasn't at issue there. I mean, that was access where you had a judge who, I guess, encouraged the press not to attend the open hearing and then sealed vaudeer transcripts. Again, none of these cases said, well, there are no transcripts, therefore, State Court, you have to make transcripts available. And neither is the bail fund saying that. Can you point us to any case where the court has held that the First Amendment right of access is satisfied where there is no comprehensive recording otherwise made available? Well, I can say that the cases, as we point out in our brief, that the other courts of appeals, I think roughly five of the eight and the district courts, have upheld Rule 53. And I understand, obviously, in federal courts that transcripts or at least audio recordings are made. However, again, those cases, other than a couple of them, don't even mention transcripts. I mean, so it's just inferring that the court held there's no First Amendment right to record because there's a transcript, but they didn't talk about transcripts. Well, perhaps it's because it's done so regularly. I wonder, is there anything in the record that indicates for us, were we to affirm here, I recognize it's an as-applied challenge, but what would be the consequence more broadly than this case? How many other jurisdictions are there where there is no comprehensive recording otherwise made available and there's a prohibition on any recording other than note-taking by a member of the public? Well, first off, I mean, it has a statewide impact because, as I mentioned, the magisterial district courts, as they operate outside of Philadelphia, are much different logistically and administratively how they operate. I don't have, and I could provide supplemental briefing on the issues, but I know there's states that have, you know, as I mentioned earlier in my principal argument, that do have some arraignments and bail issues that aren't on the record, but there's no verbatim record made. So, I think even though this is limited to Philadelphia, as I mentioned, it's also going to have an impact across Pennsylvania because in the magisterial district courts, they're not dedicated just to do arraignments. Arraignments happen different times of the day. You know, the police arrest somebody, they bring them in in front of the magisterial district judge. So, this ruling, and again, there is a challenge of how it occurs in Allegheny County as well, really impacts across the state, which is why the state Supreme Court, which is looking at arraignments in Philadelphia now, is in the best position to determine what to do. And again, balancing all these constitutional issues, as Judge Phipps referred to, that are at play here. You mentioned that there are related issues in the Pennsylvania Supreme Court. Are you suggesting that their decision could moot this appeal? I guess, and I'm not privy to what's going on, but I'm suggesting, like, for instance, I know the Institute for Constitutional Advocacy filed an amicus brief asking that the arraignments should be made verbatim. And I believe the Defenders Association and the ACLU, who represents the petitioner in that case, has raised that issue. Certainly, as I'm sure the court probably saw in Judge Cleland's report, he said that the policy issue, you know, there's different cost-benefit analysis. So, it's not before the Supreme Court, I mean, they took the case under King's bench jurisdiction, so it's not as if, like this case, where it's a direct, you know, confrontation, but the arraignment court magistrates, municipal court, are the respondents in that case. So, the issue is before the Supreme Court. I mean, the Supreme Court could decide that we're going to make these verbatim. You have an advance, like a Younger v. Harris or other sort of abstention issue to say, hey, hold off on this because it could go away. I mean, sooner or later, you play this game of mites. They might do this, they might do that, you get infested with mites, and then we're waiting and we don't get a right result. So, you have never advocated that we wait. You're just saying, incidentally, you know, this could go away. But that hasn't risen to the level of a legal argument, right? Correct, Your Honor. We have not raised that. And my point in pointing it out more is just, again, to, as the Supreme Court and other courts have held, it's really a policy decision for either the legislature or, in Pennsylvania, the Supreme Court to decide and to experiment on these matters. And that's why I bring it up. Just to make sure I'm clear, to circle back to my question earlier, I had asked you whether there was any case you can point us to where it was held to be consistent with the First Amendment right of access, for there to be no other comprehensive record that was available or created, and there's a prohibition on the members of the public making any recording other than note-taking. You pointed to a number of cases where there was, in the background, a comprehensive record. Are you aware of any case, like this one, where there otherwise is no comprehensive record that is made available to the public? And I would say, just to clarify, comprehensive, you mean a verbatim? Verbatim recording or transcript. Yeah, not that I'm aware of as I'm here today, Your Honor. So can I just pick up on that? I mean, it seems that there might be a little kind of different people getting treated differently scenario going on here. Parties to the case get better treatment. They get the option under subsection D to elect to make a recording if they want, but members of the public don't. And so it strikes me that public access is not first-class access. It's something less than first-class access. And so I suppose you're going to say that, no, the Sixth Amendment gives a more direct right than the First Amendment. But a lot of times, when I read the case law, there's a coupling between the Sixth Amendment and between the First Amendment, and courts aren't saying, oh, we can have disparate levels of access. Maybe it makes sense for the Sixth Amendment to be a little more robust, but do you have any thoughts on kind of the fact that first-class access isn't for the public in terms of the option to make recordings? Yes, Your Honor. Well, I think, first off, you do have these competing constitutional considerations here. I mean, certainly, I think that the state courts and the federal courts have an affirmative constitutional duty to minimize prejudice. And we've talked about the potential prejudice in the brief. In addition, the Rule 112, which allows recordings to be made, really doesn't have it's more, I would say, in my experience, in my experience in being a magisterial district court, not in Philadelphia, but outside, is that where the recordings are really made are during preliminary hearings. Because throughout Pennsylvania, preliminary hearings do not have to be, you know, there's no verbatim court transcript of that. So, for instance, if you're in a preliminary hearing, you'd often as a party, could bring a court reporter or a tape or a digital audio recording to record, let's say, if it's a police officer's testimony or something along those lines for potential, you know, impeachment or cross-examination purposes later on. So, again, I think that to the extent that when you look at the federal cases that interpret the Court Reporters Act, the Tenth and the Fifth Circuit have said that the purpose of the Court Reporters Act are for the parties and for the courts on appeal. First and foremost, for the transcripts. Certainly that, you know, again, and that has to be balanced with the public and press's First Amendment right to attend and obtain information as well. All right. Judge Weinberg, any further questions? No, I have no more questions. All right. We will take the case under advisement. We thank counsel for a truly excellent briefing and oral argument this morning.